# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| THE YORK GROUP, INC., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-06-0262 |
| | § | |
| HORIZON CASKET GROUP, INC., | § | |
| *et al.*, | § | |
| Defendants. | § | |

-----------------------------------------------------------------------------------------------------------

| | | |
|---|---|---|
| THE YORK GROUP, INC., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-05-2181 |
| | § | |
| HORIZON CASKET GROUP, INC., | § | |
| *et al.*, | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER ON DELTA DEFENDANTS' MOTION
## FOR PARTIAL SUMMARY JUDGMENT

This is a civil commercial lawsuit brought by Plaintiff The York Group, Inc.

("York") against various defendants, including Delta Casket Company, Inc., and Delta

Casket Enterprises, Inc. (collectively, "Delta"), and two Delta executives, Gerald

Kilpatrick and William Grubbs.  Delta, Kilpatrick, and Grubbs have filed a Motion for

Partial Summary Judgment ("Motion") [Doc. # 142 in Case No. 05-2181[1]] seeking

summary judgment on liability on various aspects of York's breach of contract, tortious

interference and Lanham Act claims.  The Court has considered the Motion, York's

Response [Doc. # 99], Defendants' Reply [Doc. # 109], and York's Sur-Reply [Doc.

# 115].  The Court also has considered all pertinent matters of record and applicable

legal authorities, and concludes that the Motion for Partial Summary Judgment should

be **denied in part and granted in part**.

## I.   FACTUAL BACKGROUND

The undisputed factual record is set out in more detail in the Court's

Memorandum and Order of October 13, 2006 [Doc. # 108 in Civil Case No. 05-2181]

(the "Prior Order").   Briefly, York manufactures caskets that are purchased by

distributors who, in turn, sell them to funeral homes throughout the United States.  In

1999, Delta and York entered a written distributorship agreement ("Agreement") that

governed Delta's use of York's "trademarks, trade names, service marks, copyrights,

---

[1]     This case was originally filed as *The York Group, Inc. v. York Southern, Inc., et al.*, but numerous defendants including York Southern, Inc., have been dismissed.  For the sake of clarity, the Court refers in the caption to the lead defendant as Horizon Casket Group, Inc., another Defendant against which York's claims still are pending.  This case has become the master case into which an earlier-filed case, *The York Group, Inc. v. Horizon Casket Group, Inc., et al.*, Civil Action No. H-05-2181, was consolidated.  Delta's Motion and many of the documents pertinent to it were filed in the earlier case and are cited accordingly.  After consolidation, however, the parties and the Court filed documents only in the instant case, Civil Action No. H-06-0262.  The Court designates documents filed in this lead case with the simple reference "Doc. # __."  This Memorandum and Order will be docketed in each case in order to create a full record of the disposition of the Motion.

patents, brand names, labels, symbols or other proprietary rights."[2]  Delta terminated the Agreement at the end of 2001.  Under the Agreement, upon termination, Delta committed "not thereafter [to] use any trademark, trade name, servicemark, brand name, label or symbol which gives or may give the impression that the relationship between the parties . . . still exists, or do any other act tending to impair or damage the Marks."[3]  York permitted Delta to continue to distribute York caskets.  Indeed, York caskets continued to make up the bulk of Delta's sales until 2004.

In 2002, Delta decided to have caskets manufactured in China for sale in the United States.  The Delta Defendants, along with other York distributors, formed The Horizon Group, Inc., to implement this plan.  By 2004, Delta obtained Chinese-manufactured caskets which it sold in United States markets where York sold its products.  These imported caskets were apparently branded as Horizon caskets.  York contends that Delta's importation and sale of the Chinese caskets was a breach of the Agreement and a violation of the Lanham Act, and that Delta interfered with York's contracts with other distributers of its products.

---

[2]      Agreement, Section 4.1, at 7.  Collectively, these protectable assets are referred to as "the Marks."  *Id*.

[3]      *Id*. at Section 4.2, at 7.

## II.    SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case for which that party will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002).  In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P.  56(c); *Celotex Corp.*, 477 U.S. at 322-23; *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003).

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).  The moving party, however, need not negate the elements of the non-movant's case.  *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).  The moving party may meet its burden by pointing out "'the absence of evidence supporting the

nonmoving party's case.'" *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (quoting *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 913 (5th Cir. 1992)). However, if the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the non-movant's response. *ExxonMobil Corp.*, 289 F.3d at 375.

If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001). "An issue is material if its resolution could affect the outcome of the action.  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations omitted).

In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).  However, factual controversies are resolved in favor of the non-movant "only when there is an actual controversy—that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999).  The non-movant's burden is not met by mere

reliance on the allegations or denials in the non-movant's pleadings. *See Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002) (noting that unsworn pleadings do not constitute proper summary judgment evidence). Likewise, "unsubstantiated or conclusory assertions that a fact issue exists" do not meet this burden. *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). Instead, the nonmoving party must present specific facts which show "the existence of a 'genuine' issue concerning every essential component of its case." *Id.* In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts. *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

Finally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *See id.* (internal citations and quotations omitted); *see also De la O v. Hous. Auth. of El Paso*, 417 F.3d 495, 501 (5th Cir. 2005).

III.   **ANALYSIS**

A.   **Timeliness of York's Summary Judgment Response**

Delta moves to strike York's response to the Motion for Partial Summary Judgment [Doc. # 107].  Delta complains that York's Response, which was due on May 9, was not filed until May 10.  While technically late, York's Response was filed at 12:21 a.m. on May 10.  Delta contends that this 21-minute delay prejudiced it because it "was forced to spend time researching case law and drafting a motion to strike York's untimely response filed without leave of court."[4]  In other words, Delta argues that it was prejudiced in that it was forced to expend time and effort to decide if it could complain of prejudice.  This argument is entirely unpersuasive.  York's 21-minute tardiness caused no meaningful prejudice to Delta and there is no valid reason for the Court to reject York's Response.  Delta's motion to strike [Doc. # 107] York's summary judgment response is **denied**.[5]

B.   **York's Claims for Discounts and Rebates**

Under the parties' 1999 Agreement, York offered a 5% discount to Delta if it paid invoices within nineteen days (the "prompt payment discount").  This prompt

---

[4]      Reply to Motion to Strike [Doc. # 114], at 4.

[5]      In the interests of justice, the Court **grants** York's Motion for Leave to File One-Hour Late [Doc. # 110] and its Motion for Leave to File a Sur-Reply [Doc. # 115] to the summary judgment motion.

payment discount continued after the parties terminated the Agreement in 2001 and continued to do business under individual sales invoices.[6] Each invoice offered Delta the 5% prompt payment discount as well as a second discount, referred to as the "YDA Sales Incentive" (the "YDA discount") for an aggregate discount of 16% off the original price of caskets Delta purchased from York, assuming Delta in fact paid the invoice within nineteen days.[7]

York "seeks to recover as damages a sum equal to the amount of all discounts afforded Delta during the term of the oral contract."[8] The exact nature and terms of those discounts are disputed. York describes a purported supplemental contract, evidenced by a series of letters between the parties, that allegedly obligated Delta to purchase 95% of its casket requirements from York.[9] Delta denies that it was bound by any such requirement, and asserts in its Motion that each invoice between the parties constituted an integrated agreement for Delta's purchase of the caskets shipped with each invoice. Delta correspondingly contends that there was neither an overriding

---

[6]   *See, e.g.,* Sales Invoice dated October 28, 2003 ("Invoice"), Motion, Exhibit D, at 26. The Invoice in the record is an exemplar; Delta has offered evidence that identical terms were present on every invoice for caskets Delta purchased from York. *See* Deposition of Joseph Bartolacci, Motion, Exhibit E, at 293-94.

[7]   *Id.*

[8]   Second Amended Complaint [Doc. # 128], at 12, ¶ 38.

[9]   *Id.* at 11, ¶ 38.

commitment that Delta would purchase specific quantities of York products nor an obligation to purchase a minimum percentage of its requirements from York.  Delta persuasively focuses on to the following merger clause in each of the invoices:

> The terms and conditions of sale are only those stated below and on the other side of this form. . . .  The parties agree there are no agreements between the parties, oral or written, with respect to the goods sold hereunder (including any made or implied from past dealings) except as expressed herein.[10]

Each invoice, drafted by York, thus explicitly disclaims the existence of any written or oral agreements made prior to or other than as reflected in the terms of that invoice.

As noted, each invoice contains two provisions regarding discounts: 11% for the "YDA Sales Incentive" (*i.e.*, the YDA discount)[11] and the 5% prompt payment discount.[12]  Both parties explain that the "YDA" is the "York Distributors' Association."[13]  Kilpatrick was apparently a member of the YDA during the relevant time period.[14]  There is no definition of the term "YDA Sales Incentive" in any invoice.

---

[10]     Invoice, at 28, ¶ 1.

[11]     *Id*. at 26.

[12]     *Invoice*, at 26.

[13]     *See* Motion, at 13; Response, at 22.

[14]     *See* Letter from York Distributors' Association to Jonathan Maurer ("YDA Letter"), Response, Exhibit I (signed by Gerald Kilpatrick as "Secretary/Treasurer").

To prevail at trial on the discount claim, York has the burden to establish *inter alia* that the YDA discount was contingent on Delta's purchase of a minimum number of York caskets. There is no such requirement apparent from the invoices themselves. York instead contends that the YDA discount is governed by communications other than the invoices, which other communications allegedly form an informal "contract" between itself and Delta.[15] York's argument that there is some post-Agreement "supplemental contract" between York and Delta – other than each individual invoice – is rejected. Through express terms, each invoice addresses and controls all necessary contract terms, such as the number and types of caskets, the cost and payment requirements for the caskets listed in the invoice, and what discounts are applicable. This conclusion is reinforced by the broad integration clause in each invoice, which terminates any conflicting agreement.[16]

There is a fact issue, however, concerning interpretation of the YDA discount referred to in each invoice. The scope of the YDA discount cannot be determined from the face of the invoices. The issue is whether parol evidence of the parties'

---

[15]     Indeed, contrary to the face of the invoices, York contends that the invoices are not relevant to the discount program. *See* Response, at 11.

[16]     The invoices' integration clause does not appear to affect York's claim that Delta violated the surviving terms of the parties' original distributorship Agreement. The parties have not fully addressed the relationship of the invoices' integration language to the claims founded on surviving clauses of the Agreement, however, and the Court does not reach the issue. This ruling does not address obligations the parties may have to each other under surviving clauses of the Agreement.

understanding of that term is admissible.  Where parties have entered into a *fully*

integrated contract, "the parol evidence rule precludes the enforcement of inconsistent

prior or contemporaneous agreements." *Satre v. Dommert*, 184 S.W.3d 893, 899 (Tex.

Civ. App.—Beaumont 2006, no pet.) (citing *Hubacek v. Ennis State Bank*, 159 Tex.

166, 317 S.W.2d 30, 31 (1958)).  "When an agreement is partially integrated,"

however, "parol evidence is admissible to supplement or explain the contract, but not

to contradict it."[17]

It is first necessary, therefore, to determine whether the invoices are fully or

partially integrated documents.  Although Texas courts apply the doctrine of partial

integration, they have not clearly delineated the difference between fully and partially

integrated contracts.[18]  The distinction has been made in legal treatises, however, and

can be applied in this case.  "A partially integrated agreement is one that is a final and

complete expression of all the terms in that agreement, but not a final and complete

expression of all the terms agreed upon between the parties."  49 TEXAS PRACTICE:

---

[17]     49 TEXAS PRACTICE: CONTRACT LAW § 8.3 (2006).  The use of parol evidence to clarify a partially integrated document is consistent with federal law. *See* RESTATEMENT (SECOND) CONTRACTS, § 216 (1981) ("Evidence of a consistent additional term is admissible to supplement an integrated agreement unless the court finds that the agreement was completely integrated.").

[18]     *See* David R. Dow, *The Confused State of the Parol Evidence Rule in Texas*, 35 S. TEX. L. R. 457, 462-63 (1994) ("instead of distinguishing rigorously for purposes of doctrinal clarity between partially and completely integrated contracts, Texas courts generally use the phrase 'integrated contract' without providing any further elaboration").

CONTRACT LAW § 8.3 (2006).[19] *See, e.g., Bob Robertson, Inc. v. Webster*, 679 S.W.2d 683 (Tex. App.—Houston 1st Dist. 1984, no writ) ("In the case of an incomplete instrument, an exception to the parol evidence rule applies . . . ."); *Weinacht v. Phillips Coal* Co., 673 S.W.2d 677, 679 (Tex. App.—Dallas 1984, no writ) ("It is settled that when contracting parties have concluded a valid [partially] integrated agreement . . . the parol evidence rule will prevent enforcement of prior or contemporaneous agreements which are inconsistent with the [partially] integrated agreement.").[20]

Under Federal and Texas law, the Court may look to parol evidence to determine whether an invoice is a complete expression of the terms agreed upon between the parties, and thus partially or fully integrated. *See Pennzoil Co. v. F.E.R.C.*, 645 F.2d 360, 388 (5th Cir. 1981) ("It is only after consideration of the extrinsic evidence that

---

[19]    The Court applies Texas law in this diversity case because the issue of the application of parol evidence to an integrated agreement is a matter of substantive law. *See Matthews v. Drew Chemical Corp.*, 475 F.2d 146, 149 (5th Cir. 1973) ("The parol evidence rule is a matter of substantive law . . . ."); RESTATEMENT (SECOND) CONTRACTS, § 210, Comment (a). It is noted that under Federal law, the invoices also would be considered partially integrated. *See Walley v. Bay Petroleum Corp.*, 312 F.2d 540, 544 (5th Cir.1963) ("if the writings are but a partial integration of the agreement, the rest of the agreement, or collateral agreements, may be shown through parol"); *Recursion Software, Inc. v. Interactive Intelligence, Inc*., 425 F. Supp. 2d 756, 773 (N.D. Tex. 2006); RESTATEMENT (SECOND) CONTRACTS, § 210, Comment (a) (1981) (rejecting "the assumption sometimes made that because a writing has been worked out which is final on some matters, it is to be taken as including all the matters agreed upon").

[20]    These cases apply the distinction between partial and full integration without making the difference explicit. Because Texas courts "use the word 'integrated' equivocally," only the courts' decision to admit or bar supplemental parol evidence reveals whether the contract in question was partially or fully integrated. Dow, *The Confused State of the Parol Evidence Rule in Texas*, 35 S. TEX. L. R. at 464.

the parol evidence rule applies if in light of the circumstances and purposes of the contract the court finds it unambiguous and integrated . . . ."); 49 TEXAS PRACTICE: CONTRACT LAW § 8.3 (2006) ("Until the contract is deemed either unintegrated, partially integrated, or fully integrated, the parol evidence rule does not bar any evidence.") (citing *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981); *Mobil Exploration & Producing U.S., Inc. v. Dover Energy Exploration, L.L.C.*, 56 S.W.3d 772, 776–77 (Tex. App.—Houston [14th Dist.] 2001, no pet.)).  The term "YDA Sales Incentive" is not defined in any invoice and thus the invoices are not fully integrated agreements; they are "not a final and complete expression of all the terms agreed upon between the parties."  49 TEXAS PRACTICE: CONTRACT LAW § 8.3 (2006).  The Court concludes further that there is a genuine and material fact issue as to what the term YDA Sales Incentive means and when it applies.

It thus is necessary to determine what parol evidence is admissible as supplementing and not contradicting the contracts contained in the invoices.  Texas courts have not established a clear method for making this determination.[21]  York seeks to use the testimony of Jonathan Maurer, York's president during the relevant time period, to establish that the YDA Sales Incentive was contingent on Delta's

---

[21]     *See* 49 TEXAS PRACTICE: CONTRACT LAW § 8.3 (2006) ("The distinction between evidence which supplements or explains versus evidence which contradicts is obviously elusive, and Texas courts have not put forward a simple method for ascertaining which category the proffered evidence falls into.").

commitment to purchase 95% of its caskets from York.[22]  York also points to testimony

in other depositions that, it argues, reflect the intent of the parties in establishing the

YDA discount.[23]  York further has submitted correspondence from York to Presley

Melton[24] (one of York's distributors, a YDA member, and a prior defendant in this

lawsuit) and from the YDA itself to Maurer[25] as evidence about various people's

understandings of the YDA discount program.  While this evidence is inconsistent on

the applicability of the YDA Sales Incentive, the evidence does not "contradict" the

terms of the invoices, which in pertinent part merely list the 11% discount next to the

words "YDA Sales Incentive."[26]   The letters and depositions accordingly are

---

[22]    *See* Deposition of Jonathan Maurer, Response, Exhibit F, at 199-200.

[23]    *See* Deposition of Gerald Kilpatrick, Response, Exhibit H, at 94-96; Deposition of Joseph
Bartolacci, Response, Exhibit A, at 470-71.

[24]    *See* Letter from Jonathan Maurer to Presley Melton ("Maurer Letter"), Response, Exhibit G.
The Maurer Letter, written by York's president at the time, describes a sliding scale of
discounts pegged to explicit purchase amounts, with the full 16% discount available only if
the distributor paid within nineteen days *and* purchased 98% of its casket requirements from
York.  *See* Maurer Letter, at 01449.  This 98% figure and other explanations are inconsistent
with York's current description of the program.  York contends that the contract obligated
Delta to purchase *95%* of its caskets from York in order to receive the maximum discount.
*See* Response, at 11.  The Maurer letter elaborates that a distributor could purchase as little
as 86% of its total requirements from York and still receive the 11% discount.  Maurer
Letter, at 01449.

[25]    *See* YDA Letter.  The YDA Letter also stated that distributors believed they were entitled to
the full 16% discount because the YDA agreed to "assume the liabilities of the York Group's
discount and rebate contractual obligations to all death care establishments," and makes no
reference to percentages of distributors' purchases.

[26]    Invoice, at 26.  This is listed in addition to the further 5% if the balance is paid within 19 days.

admissible parol evidence because they supplement the terms of the invoices as potential explanations of the undefined invoice term "YDA Sales Incentive."  As indicated above, this evidence raises material fact issues pertaining to the applicability of the YDA Sales Incentive and whether the parties had a mutual understanding about the term in the invoices.

### C.    Claim for Lanham Act Trade Dress Violation

Delta argues that York has failed to assert a viable claim that "the Delta entities infringed upon the trade dress of its line of metal and wood caskets."[27]  York concedes this point, stipulating that it "has not pled a trade dress infringement cause of action."[28] York made the same stipulation in response to the earlier Joint Motion for No Trade Dress Infringement [Doc. # 62].  The Court  accepts York's construction of its own claims and will hold York to its representations that it has not pled a cause of action for trade dress infringement.[29]

Delta nevertheless suggests that York "present[s] essentially a trade dress case through its breach of contract claim."[30]  Delta seeks a ruling as a matter of law that there is no question of material fact that York's caskets "do not have a 'recognizable

---

[27]    Motion, at 14.

[28]    Response, at 2.

[29]    *See* Memorandum and Order of April 17, 2007 [Doc. # 86].

[30]    Reply, at 10.

and consistent overall look' that affords them protection under copyright law."[31]  The

Court again responds that York's breach of contract theories against any Defendant's

must rest solely on breaches of contractual duties established by the parties'

Agreement, not requirements of "copyright law" or trade dress doctrines.

### D.    Survival of Sections 4.1, 4.2, and 6.6 of the Agreement

Delta argues, as it has elsewhere, that Section 8.17 of the Agreement is an

exclusive survival clause and any section of the Agreement not listed there expired

when the Agreement was terminated.   This Court disagrees.   As stated in the

Memorandum and Order issued on July 10, 2007 [Doc. # 153], the list in Section 8.17

of clauses that survive termination of the Agreement is not exclusive.  Delta focuses on

Sections 4.1, 4.2, and 6.6.   Each of these provisions survived termination of the

Agreement.  Section 4.1 is listed in the Section 8.17, the survival clause, and Sections

4.2 and 6.6 each survive by virtue of their plain language.[32]

### E.    Validity of the Agreement's Limitation of Damages Clause

Delta argues that if any section of the Agreement other than those listed in

Section 8.17 survive, then the limitation of damages clause, Section 7.1, survives also.

---

[31]      Motion, at 17.

[32]      By Section 4.2, Delta agreed not to "at any time during *or after the Term*, register or use any
mark that is similar to a Mark . . . without the express written authorization of York"
(emphasis added).  Similarly, Section 6.6 applies only "*[u]pon termination of this Agreement*
for any reason." (emphasis added).

That section provides that "[t]he exclusive measure of damages recoverable . . . under this Agreement . . . shall not include any amounts for indirect, special, consequential, punitive, or exemplary damages of any party . . . even if such damages are foreseeable."[33]  Accordingly, Delta argues, the Court should preclude any request for punitive damages under any theory, because all of York's theories "are claims arising 'under this Agreement.'"[34]  Delta also asks the Court to deny York's claim for lost profits and/or an accounting, because "they are forms of consequential damages."[35]

York does not dispute, and the Court concurs, that the limitation of damages provision survives termination of the Agreement.  York argues, however, that the damages limitation clause should not apply to any of its claims other than its breach of contract claim.[36]  York's reading is correct.  Section 7.1 limits "damages recoverable by either party from the other party *under* this Agreement."[37]  Its plain language limits recovery of damages founded on breach of contract theories, as those breaches create

---

[33]     Agreement, Section 7.1.

[34]     Motion, at 20.

[35]     *Id.* at 21 (citing *Trenholm v. Ratcliff*, 646 S.W.2d at 92, 933 (Tex. 1983)).

[36]     York also argues that Delta failed to plead this affirmative defense in its Answer.  *See* Response, at 7.  Delta did properly plead the defense, however.  *See* Delta's Amended Answer to Plaintiff's First Amended Original Complaint [Doc. # 97 in Case No. 05-2181], at 8, ¶ 9 ("York's claims for damages are limited pursuant to its 1999 Distributor Agreement with the Delta entities.").

[37]     Agreement, Section 7.1 (emphasis added).

"damages recoverable . . . under this Agreement."  Damages associated with York's related theories, such as tortious interference, may be "connected" or "related" to the Agreement, but such damages would be recoverable "under" tort doctrine, not the Agreement itself.

York also argues that its alleged lost profits do not fall under the limits of Section 7.1 because they are not "indirect, special, consequential, punitive or exemplary damages."  York thus contends that its alleged lost profits are not precluded by the Agreement with respect to York's breach of contract claim.[38]   The Court is unpersuaded.   The Texas Supreme Court recently stated that lost profits are consequential damages. *See Tooke v. City of Mexia*, 197 S.W.3d 325, 346 (Tex. 2006) (Plaintiffs' "only claim is for lost profits, which are consequential damages excluded from recovery under the statute" in question.) (citing *Trenholm v. Ratcliff*, 646 S.W.2d 927, 933 (Tex. 1983); *Henry S. Miller Co. v. Bynum*, 836 S.W.2d 160, 163-164 (Tex. 1992)).   *Tooke*, *Trenholm*, and *Miller* each address claims for damages pursuant to specific statutes, and York argues that *Tooke*'s flat characterization of lost profits as "consequential damages" is inapplicable *dicta*.[39]   It urges the Court to apply instead *Continental Holdings, Ltd. v. Leahy*, 132 S.W.3d 471 (Tex. App.—Eastland 2003, no

---

[38]     *Id*.

[39]     *See* Sur-Reply, at 4.

pet.), as an example of a breach of contract case in which the court held that the plaintiff's lost profits were direct, rather than consequential, damages.[40] "Profits lost on the breached contract itself, such as the amount that [plaintiff] would have received on the contract less its saved expenses, are classified as 'direct' damages. Profits lost on other contracts or relationships resulting from the breach are classified as 'indirect' damages." *Id*. at 475.

Applying *Continental Holdings* in this case yields the same result as applying *Tooke*. York alleges that Delta breached its contract after the Agreement expired, because certain provisions survived the termination of the Agreement. Those provisions governed Delta's conduct with regard to York's intellectual property, but did not generate any direct profit for York. York has not alleged a breach of contract theory, based on the Agreement, under which it can show "[p]rofits lost on the breached contract itself." *Continental Holdings*, 132 S.W.3d at 475. York's theory instead is that Defendants' misuse of York's intellectual property forced it to compete with less expensive, infringing products, and that it lost sales and thus profits as a result. York is effectively alleging that its damages are "[p]rofits lost on other contracts or relationships resulting from the breach," which are "'indirect'" damages. *Id*. The limitations clause prohibits both "consequential" damages (as in *Tooke*) and "indirect"

---

[40]      *See* Response, at 9.

damages (as in *Continental Holdings*).  York therefore may not recover lost profits on its theory that Delta breached the Agreement.[41]

## F.   **Tortious Interference**

The Delta entities move for summary judgment on York's claim of tortious interference with contract on two separate bases.  The first argument is that Grubbs and Kilpatrick are not individually liable for their actions taken on behalf of their respective corporations.[42]  The second contention, advanced on behalf of the corporate Delta defendants, is that because the Court found that a "best efforts" clause in York's contract with the Melton Defendants was unenforceable,[43] the comparable clause in the Delta and other distributors' Agreements cannot be the basis of a claim for tortious interference with contracts.[44]  In its Reply, however, Delta attacks the tortious

---

[41]    This ruling does not apply to York's theory that Delta breached the later agreement controlling the discounts Delta took on its purchases of York caskets.  The parties have not briefed the more complex question of whether the alleged subsequent agreements concerning discount arise "under [the] Agreement," Agreement, Section 7.1, and the Court does not reach the matter at this time.

[42]    *See* Motion, at 11.

[43]    *See* Memorandum and Order of October 10, 2006 [Doc. # 42] (holding that, because the Distributorship Agreement between York and the Melton defendants (identical to the Agreement in all relevant parts) did not set a "goal or guideline" against which to measure "best efforts," the clause is unenforceable under Texas law).

[44]    *See* Motion, at 17.  Delta also argues that York pled this cause of action only against Horizon.  *See* Reply, at 11.  During the discovery hearing held on June 7, 2007, however, the Court held that York's First Amended Complaint [Doc. # 5 in Case No. 05-2181] was adequate, under notice pleading standards, to support a tortious interference claim against the
(continued...)

interference claim on a third basis, arguing that the Amended Original Complaint [Doc. # 5 in Case No. 05-2181], the live complaint at the time Delta filed the Motion, asserts a tortious interference claim only against Horizon.[45]  York has since filed its Second Amended Complaint, which explicitly accuses Grubbs, Kilpatrick, and the other Delta entities of tortious interference with York's contracts with its distributors.  Contending that the claim was not originally pled or added through a timely amendment, Delta has filed a Motion to Strike [Doc. # 134], which is not yet ripe for review.  The Court accordingly will decide the viability of York's tortious interference claims against the individual and corporate defendants with the Motion to Strike.

## IV.   <u>CONCLUSION AND ORDER</u>

Parol evidence as to the meaning "YDA Sales Incentive" is admissible to clarify the terms of the York/Delta invoices.  Interpretation of that evidence is a matter for trial and summary judgment is inappropriate on the meaning of the YDA Sales Incentive term of York's invoices to Delta.  The Court also holds that Sections 4.1, 4.2 and 6.6 survive termination of the Agreement and the Agreement's limitation of liability clause survives and applies to York's claim that Defendants violated the Agreement.  York

---

[44]     (...continued)
Delta defendants as well.  York's Second Amended Complaint, filed with the Court's permission, explicitly asserts this claim against all Defendants.

[45]     *See* Reply, at 11.

will not be able to recover lost profits under its theory that Delta violated the surviving terms of the Agreement.  The Court does not reach the parties' arguments on the tortious interference claims against Delta, Kilpatrick and Grubbs.  It is therefore

**ORDERED** that Delta's Motion to Strike York's Response to the Motion for Partial Summary Judgment [Doc. # 107] is **DENIED**.  It is further

**ORDERED** that York's Motion for Leave to File One-Hour Late [Doc. # 110] is **GRANTED**.  It is further

**ORDERED** that York's Motion for Leave to File a Sur-Reply [Doc. # 115] is **GRANTED**.  It is further

**ORDERED** that Delta's Motion for Partial Summary Judgment [Doc. # 142 in Case No. 05-2181] is **GRANTED in part** and **DENIED in part** as set forth in this Memorandum and Order.

SIGNED at Houston, Texas this 11<u>th</u> day of **July, 2007**.

Nancy F. Atlas
United States District Judge